1

2

3

4

5              IN THE UNITED STATES DISTRICT COURT

6                 FOR THE DISTRICT OF ARIZONA

7

8   BELINDA B. FULTON,            )
                                  )
9          Plaintiff,             )
                                  )
10         v.                     )     CIV 05-2151 PHX MEA
                                  )
11  JOANNE BARNHART, Commissioner )
    of Social Security,           )     MEMORANDUM & ORDER
12                                )
           Defendant.             )
13  _____)

14         The parties have consented to have all proceedings in

15  this case conducted before a United States Magistrate Judge

16  pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of

17  Civil Procedure.

18         Plaintiff, Ms. Belinda Fulton, brought this action

19  pursuant to 42 U.S.C. § 405(g), seeking judicial review of the

20  final decision of the Commissioner of the Social Security

21  Administration, Defendant Joanne Barnhart (the "Commissioner"),

22  denying Plaintiff's claim for disability insurance benefits

23  pursuant to Title II of the Social Security Act, codified at 42

24  U.S.C. §§ 401-433.

25      **I  Procedural History**

26         Plaintiff filed an application for disability insurance

27  benefits and Supplemental Security Income ("SSI") benefits on

28  June 28, 2002.  Administrative Record on Appeal ("R.") (Docket

    No. 9A) at 69-70.  Plaintiff's application for benefits was

denied initially and on appeal. Id. at 22. Plaintiff requested a hearing regarding her eligibility for benefits, which was conducted before an Administrative Law Judge ("ALJ") on April 14, 2004. Id. at 22 & 47. The ALJ concluded Plaintiff was not disabled as that term is defined by the federal Social Security statutes and denied Plaintiff benefits. Id. at 30. The Social Security Appeals Council denied review of this decision, rendering the ALJ's decision the final decision of Defendant, the Commissioner of the Social Security Administration, for purposes of judicial review. See 20 C.F.R. § 404.981 (2005).

Plaintiff filed a Complaint for Judicial Review of Administrative Determination of Claim for Social Security Disability Benefits on July 21, 2005. Plaintiff alleges in her Complaint that the ALJ erred in her findings of fact and application of the law when concluding that Plaintiff is not disabled as that term is defined by the Social Security statutes.

## II   Standard of review

The Court's jurisdiction extends to review the final decision of Defendant denying Plaintiff's application for Social Security disability benefits pursuant to 42 U.S.C. § 1383(c)(3). Plaintiff and Defendant have filed motions seeking judgment as a matter of law. See Docket No. 13 & Docket No. 17.[1]

_____

[1] In an unpublished opinion in a Social Security case arising in the District of Arizona, the Ninth Circuit Court of Appeals stated: "Although the parties and the District Court refer to the District Court's disposition as 'summary judgment,' such terminology is most inaccurate." Shafer v. Barnhart, 120 Fed. App. 688, 691 (9th Cir. 2005). Therefore, the Court will not recite the standard of review regarding a motion for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, although the motions before the Court are styled as motions for summary judgment.

Judicial review of a decision of the Commissioner is based upon the pleadings and the record of the contested decision. See 42 U.S.C. § 405(g) (2003 & Supp. 2005). The scope of the Court's review is limited to determining whether the Commissioner, i.e., the ALJ, applied the correct legal standards to Plaintiff's claim and whether the record as a whole contains substantial evidence to support the ALJ's findings of fact. See id. § 423; Bustamante v. Massanari, 262 F.3d 949, 953 (9th Cir. 2001); Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001). If an ALJ's error was harmless, the case need not be remanded for further proceedings. See Batson v. Commissioner of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004); Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990); Booz v. Secretary of Health & Human Servs., 734 F.2d 1378, 1380 (9th Cir. 1984)

Satisfying the substantial evidence standard requires more than a mere scintilla but less than a preponderance of evidence. See, e.g., Bustamante, 262 F.3d at 953. Substantial evidence has been defined as the amount of relevant evidence that a reasonable mind would accept as adequate to support a conclusion. See, e.g., Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Evidence is insubstantial if it is overwhelmingly contradicted by other evidence in the administrative record. See Threet v. Barnhart, 353 F.3d 1185, 1189 (10th Cir. 2003); Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983); Robison v. Barnhart, 316 F. Supp. 2d 156, 163 (D. Del. 2004); Rodriguez v. Barnhart, 252 F. Supp. 2d 329, 332 (N.D. Tex. 2003); Rieder v. Apfel, 115 F. Supp. 2d 496, 501 (M.D. Pa. 2000).

Because the ALJ is responsible for weighing the evidence, resolving conflicts, and making independent findings of fact, the Court may not decide the facts anew, re-weigh the evidence, and decide whether a claimant is or is not disabled. See Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001); Powers v. Apfel, 207 F.3d 431, 434-35 (7th Cir. 2000).   If the evidence can support either outcome, the reviewing court may not substitute its judgment for that of the ALJ.   Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Casey v. Secretary of Health & Human Servs., 987 F.2d 1230, 1233 (6th Cir. 1993).   However, the Commissioner's decision "cannot be affirmed simply by isolating a specific quantum of supporting evidence."   Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).   See also Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001).

### III   Statement of the Law

Title II of the Social Security Act provides for the payment of benefits to individuals who suffer from a "disability." See 42 U.S.C. § 423(a)(1)(D) (2003 & Supp. 2005).

To establish eligibility for disability benefits under the Social Security Act, the claimant must show that: (1) she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months, see id. § 423(d)(1)(A); and (2) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists

in the national economy.  <u>See</u> <u>id.</u> § 423(d)(2)(A).  If a claimant meets both of these requirements, she is by definition "disabled."  <u>See</u> <u>Tackett</u>, 180 F.3d at 1098.

The Social Security Administration regulations prescribe a five-step sequential process for determining whether a claimant is "disabled."  <u>See</u> 20 C.F.R. § 404.1520 (2005).  The burden of proof is on the claimant throughout steps one to four.  <u>See</u> <u>Tackett</u>, 180 F.3d at 1098.  If a claimant is found to be "disabled" or "not disabled" at any step in the sequential process, there is no need to proceed to the subsequent step(s).  <u>See</u> <u>id.</u>

First, the claimant must establish that she is not gainfully employed at the time of her application.  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(i) (2005).  Next, the claimant must be suffering from a "medically severe" impairment or "combination of impairments."  <u>Id.</u> § 404.1520(a)(4)(ii).  The third step is to determine whether the claimant's impairment meets or equals one of the "listed" impairments included in Appendix 1 to this section of the Code of Federal Regulations.  <u>See</u> <u>id.</u> § 404.1520(a)(4)(iii).  If the claimant's impairments meet or equal one of the impairments listed in Appendix 1, the claimant is conclusively "disabled."  <u>See</u> <u>id.</u>  The fourth step of the process requires the ALJ to determine whether the claimant can perform work similar to work she has performed in the past.  A claimant whose "residual functional capacity" allows her to perform "past relevant work" despite her impairments, will be denied benefits.  <u>See</u> <u>id.</u> § 404.1520(a)(4)(iv).  If the claimant cannot perform her past relevant work, at step five the burden

shifts to the Commissioner to demonstrate that the claimant can perform other substantial gainful work that exists in the national economy.   See id. § 404.1520(a)(4)(v); Tackett, 180 F.3d at 1098.

## IV   **Statement of Facts**

Plaintiff was born in 1957 and was approximately 44 years old at the time she filed her application for disability benefits in June of 2002.   Record on Appeal ("R.") (Docket No. 9A) at 28 & 420.   Plaintiff did not complete high school and previously worked as a grocery store cashier.   Id. at 23 & 100. Plaintiff's application for benefits alleged she could not work, due to asthma and back pain, as of May 8, 2001.   Id. at 65 & 69 & 72.   Plaintiff's application was later amended to allege an inability to work as of June 30, 2002, as Plaintiff had worked after May 8, 2001, and before June 30, 2002.   Id. at 137. Plaintiff is insured for disability benefits through at least December 31, 2007.   Id. at 23.

In 2001 through at least October of 2002, Plaintiff resided in Oregon.   See id. at 70.   Plaintiff was injured in an automobile accident in May of 2001.   Id. at 142-43.   A physician's notes dated May 9, 2001, indicate Plaintiff had no visible head trauma, but that she had diffuse neck discomfort. Id. at 155.   The doctor ordered a spinal CT scan.   Id.   The doctor stated: "I did not see problems with her thoracic spine CT or her cervical spine CT ... We reviewed the CAT scan that she already had at [another hospital]."   Id. at 156.   The doctor was concerned with the condition of Plaintiff's heart.   Id.

Plaintiff was referred to Dr. Libby, a pulmonary specialist and treating physician, by Dr. Dougherty, her primary care physician and treating physician, in 2001, for testing regarding her respiratory problems.  Id. at 281.  On May 16, 2001, Dr. Libby noted:

> Over the last 5-10 years she's had recurrent respiratory problems characterized by cough, sputum production, wheezy breathing, and difficulty breathing.  These have gotten progressively more frequent...
> She was seen by Dr. Maunder in 1999, she had a normal full PFT's, normal CAT scan of the chest, high resolution technique, and was originally scheduled for methacholine challenge, but apparently that never occurred.  Eventually, she was told by Dr. Dougherty that Dr. Maunder thought a lot of this was psychogenic and suggested she see a psychiatrist.  She was also told she might have fibromyalgia.
> She reports that she stopping working in 1985 after working as a dental lab technologist. She's concerned about the fact that she began getting these symptoms after being exposed to asbestos and dental plaster dust.

Id. at 289.  Dr. Libby noted Plaintiff's recurrent respiratory tract infections and cough responded "best" to "prolonged courses of antibiotics and prednisone.... I am quite suspicious that this represents an atypical presentation of asthma."  Id. at 290.

In late May of 2001, Plaintiff reported to Dr. Dougherty that she had been improving since the accident, that she had a good range of motion in her hands, and that she experienced limitations in the use of her left hand and weakness in her left arm.  Id. at 202-04.  On June 15, 2001, Dr. Dougherty reported Plaintiff's left arm and hand were much better, and she released Plaintiff to return to work on June 20,

1   2001.   Id. at 205.

2       Plaintiff was seen by a neurological surgeon, Dr.
3   Adler, a consulting physician who also examined Plaintiff, on
4   August 10, 2001.  Id. at 157.  Plaintiff's primary complaint to
5   Dr. Adler was pain in her shoulders since the automobile
6   accident.  Id. at 158.  Dr. Adler noted: "The patient was well
7   until she experienced a motor vehicle accident as a restrained
8   driver ... a diagnosis of myocardial contusion was made.  The
9   patient complains at this point of sore, achy shoulders since
10  the accident ... pain has been substituted by soreness that
11  measures a 5 on a scale of 1 to 10."  Id.  Plaintiff stated the
12  pain radiated, that her fingers became numb, and that she
13  dropped objects from her left hand.  Id.  Dr. Adler stated:
14  "[S]he is only able to lift 2.5 pounds.  Pain is the limiting
15  factor rather than weakness.  The patient has been working and
16  lifts forty pound bags.  She feels that this activity may have
17  exacerbated her problem.... The patient feels this is a muscle
18  spasm related problem."  Id.  At that time, Dr. Adler noted
19  Plaintiff suffered from asthma, and that she took Advil, Aleve,
20  and Hydrocodone.  Id.  Plaintiff reported no allergies.  Id.
21  Dr. Adler noted Plaintiff was obese.  Id.  The doctor reported
22  Plaintiff's recent and remote memory as intact, her attention
23  span as normal, and her language and speech as fluent.  Id. at
24  159.  Dr. Adler diagnosed Plaintiff as suffering from muscle
25  spasm.  Id.

26      In early September 2001, Plaintiff was seen by Dr.
27  Brett, a treating physician and spinal surgeon.  See id. at 179-
28  185.  The doctor noted Plaintiff's complaints of shoulder and

neck pain, and that she had a full range of movement in her extremities.  Id. at 179-80.  Dr. Brett noted an MRI indicated bulging at Plaintiff's C5-C6 and C6-C7 vertebrae.  Id. at 180. On September 19, 2001, Plaintiff underwent a surgical cervical discectomy, foraminotomy, decompression, and fusion of her C6 and C7 vertebrae, performed by Dr. Brett.  Id. at 185-87.

In October of 2001 Plaintiff's treating family physician, Dr. Dougherty, reported her progress after surgery as "great."  Id. at 209.  The notes state: "She has good [range of motion].  She has much better progress.  She has good motor coordination of her fingers now and mobility which she had almost completely lost.... She still has low-back pain ..."  Id. Dr. Dougherty scheduled Plaintiff for a lower back MRI.  Id. Plaintiff was prescribed Lipitor for her cholesterol level, and reported that it was making her ill, i.e., causing nausea and shaking and muscle aches.  Id.  On October 12, 2001, Dr. Dougherty reported Plaintiff had "tweaked" her neck, and "now it is painful on the [left side]."  Id. at 210.  The doctor noted Plaintiff had full range of motion in her shoulders.  Id.

On October 22, 2001, Plaintiff's surgeon, Dr. Brett, opined Plaintiff had "chronic lumbar strain with some referred leg pain only as a result of her motor vehicle accident ... She was given instructions regarding abdominal and back strengthening exercises and the principles of back mechanics, and weight loss was encouraged."  Id. at 260.  On October 30, 2001, Dr. Dougherty, Plaintiff's treating family physician opined that Plaintiff's back problems appeared to be "more musculoskeletal.  MRI was normal.  She has exercises and

stretching.  I recommended weight loss." Id. at 211.

Dr. Brett returned Plaintiff to "light work" on November 26, 2001, with restrictions regarding lifting and carrying, standing, and heavy exertion.  Id. at 211, 258.  In December 2001, Plaintiff reported shoulder pain and mid-back pain.  Id. at 213.  Doctor Brett released Plaintiff to part-time work at her previous job without restrictions on February 6, 2002.  Id. at 165, 255.  The doctor noted Plaintiff's "prognosis is good, and she is very pleased with the results of the surgery." Id. at 255.

In February of 2002 Plaintiff's treating physical therapist reported she had continued pain in her shoulders and continued tenderness and weakness in her upper extremities.  Id. at 163.  Plaintiff reported her only medication as Aleve.  Id. Plaintiff's therapist noted her surgeon had recommended additional physical therapy, deep tissue massage, and ice and heat.  Id. at 164.  After Plaintiff returned to work, her treating physical therapist noted: "demonstrating pain behavior—reports neck, upper back & [upper extremities] all sore from return to work." Id. at 165.  By late February 2002, Plaintiff was reporting "some days good, some bad." Id. at 166. On March 1, 2002, Plaintiff stated her condition had improved. Id. at 166.

On March 27, 2002, Plaintiff was again seen by Dr. Brett, the treating neurosurgeon who performed Plaintiff's spinal surgery.  Id. at 246.  Dr. Brett stated Plaintiff had low back discomfort and "some uncharacteristic symptoms of pain and dyesthesia in either leg.  Her previous lumbar MRI is

-10-

unremarkable, and she is felt to have a chronic lumbar strain with <u>referred</u> leg complaints as a result of her motor vehicle accident of 5-8-01 as per my chartnote of 10-22-01." <u>Id.</u>

> She has no objective neurologic deficit in the arms or legs with preserved strength, sensation and myotatic reflexes, no wasting or fasciculations, and no nerve root irritation signs. Cervical and lumbar range of motion are quite good, although somewhat slow, with mild paralumbar muscle spasm.
> She has done very nicely with regard to her neck with resolution of her left arm radicular pain, and repeat neck x-ray shows excellent appearance. She has occasional unrelated dyesthesia into either arm, and she seems to be somewhat "introspective" with regard to her symptoms.
> She is released for all activities without restrictions as far as her neck is concerned; but she should not lift or carry more than 25 lbs., perform any repetitive lifting, bending or stooping, or be required to sit or stand in a stationary position for more than two consecutive hours with regard to her low back. There is little that I have to offer for her chronic lumbar pain which will be permanent and moderately disabling as noted above.... I feel that she is medically stationary with regard to both her cervical and lumbar spine.

<u>Id.</u>

On March 29, 2002, Plaintiff reported "rather disturbing symptoms" to her treating family physician, Dr. Dougherty, including "dyesthesias either down an arm or a leg," and numbness without pain in her arms. <u>Id.</u> at 218. Dr. Dougherty noted that Dr. Brett had previously opined that these symptoms were unrelated to Plaintiff's surgery on her cervical vertebrae. <u>Id.</u> Dr. Dougherty noted in Plaintiff's chart that Plaintiff displayed numbness from her shoulder to her elbow, and a full range of motion in her arms and neck. <u>Id.</u> Plaintiff displayed numbness and muscle weakness on one side of her face.

Id.

Plaintiff experienced sinus problems throughout April and May of 2002. Id. at 224-25. On May 30, 2002, Plaintiff reported to her treating family physician, Dr. Dougherty, that her sinus and infection problems were greatly alleviated while she was at home and had been exacerbated by constant contact with the public since Plaintiff's return to work. Id. at 227. Dr. Dougherty opined: "She needs to stop being exposed to public contact. Her immune system is poor and this predisposes her to recurrent infections. We will write a letter addressed to her employer." Id.[2] On June 23, 2002, Dr. Dougherty's associate kept Plaintiff from work for two days due to exacerbation of asthmatic symptoms, bronchitis and sinusitis. Id. at 228.

On June 1, 2002, Plaintiff was examined by a family doctor, Dr. Blessing, also an associate of Dr. Dougherty. Id. at 229-30. Dr. Blessing noted Plaintiff had "been seen repeatedly for recurring reactive airway and bronchitis symptomatologies. When asked how long she has been coughing, she says 3 years.... She says the last 3 days she has had a temp to 101-102 degrees but in the office it is afebrile." Id. at 230. Dr. Blessing diagnosed Plaintiff as suffering from viral bronchitis which was not sensitive to antibiotics and noted: "She does not have the notion of using her beta agonist on a very frequent basis when she has this kind of coughing and so forth. Additionally, during the entire interview on

---

[2] Apparently regarding Dr. Dougherty's written opinion to Plaintiff's employer, the chartnote dated June 3, 2002, states: "Dictated letter dated 5-30-02 ready to pick up." R. at 227.

1  examination, patient does not cough once." <u>Id.</u>

2        Plaintiff filed her application for disability benefits

3  on June 28, 2002, at which time she ceased working.  Plaintiff

4  was divorced in June 2002 (she had been married for 29 years).

5  <u>Id.</u> at 62.  Plaintiff reported to Dr. Sampson in November of

6  2002 that she was married.  <u>Id.</u> at 299.

7        On July 10, 2002, Dr. Brett, Plaintiff's treating

8  neurosurgeon, noted Plaintiff was "really unchanged clinically,

9  without new neurologic deficit." <u>Id.</u> at 253.  Dr. Brett opined

10 that Plaintiff could "be working provide she not lift or carry

11 more than 10 lbs., perform any repetitive or heavy exertion with

12 the upper extremities, or maintain any awkward of stationary

13 neck positions." <u>Id.</u>  The doctor further stated: "Ms. Fulton

14 had difficulties with her neck several years ago, and her

15 current symptoms are unlikely to be directly related to her

16 motor vehicle accident of 5-8-01 which resulted in pathologic

17 worsening at her previously-treated C6-7 level." <u>Id.</u>

18       On July 31, 2002, Dr. Dougherty stated Plaintiff was

19 "scheduled for surgery for discectomy [with Dr. Brett] on

20 08/09/02.  She is not having any problems.  Her breathing is

21 doing fairly well.  She does need a PEAK FLOW meter and I have

22 given her one today." <u>Id.</u> at 231.  The doctor refilled

23 Plaintiff's prescriptions for Advair, Maxair, Lipitor, Benadryl,

24 Vicodin, and Soma.  <u>Id.</u>  At that time, Dr. Dougherty,

25 Plaintiff's treating physician, noted Plaintiff suffered from

26 her cervical problems, asthma and "allergic rhinitis." <u>Id.</u> at

27 231.  The doctor noted Plaintiff was "[o]ff work indefinitely at

28 this time pending post-surgical results." <u>Id.</u> at 231.

1          Plaintiff was also examined by her treating
2 neurosurgeon on July 31, 2002.  At that time, Dr. Brett noted:
3              She has no true radicular pain or objective
               neurologic deficit, and strength, sensation,
4              and mytatic reflexes are preserved.  However,
               cervical range of movement is reduced ...
5              with moderate paracervical muscle spasm, and
               Spurling's maneuver results in interscapular
6              pain in either direction ...
               I feel the major contributing factor to her
7              current condition and need for treatment is
               on-going degenerative change and her various
8              injuries, including her motor vehicle
               accident of 5-8-01 and her work and
9              recreational activities.

10 Id at 252.

11         Plaintiff underwent a second spinal surgery by Dr.
12 Brett on August 7, 2002, i.e., a discectomy, foraminotomy,
13 decompression and fusion of her C5 and C6 vertebrae.  Id. at
14 173, 245.  At that time, Dr. Brett reported Plaintiff's prior
15 spinal fusion was healing well.  Id. at 172.  He reported that,
16 other than the increasing disk protrusion, Plaintiff "[had]
17 enjoyed quite good health except" for "reactive airways
18 disease."  Id.  Plaintiff reported her medications as Darvocet,
19 Flexeril, and Dalmane.  Id.  Dr. Brett noted Plaintiff's
20 cervical movement was "moderately reduced with moderate
21 paracervical spasms."  Id.

22         Dr. Brett, Plaintiff's treating neurosurgeon, released
23 her for "light work," with a lifting restriction, a restriction
24 on heavy exertion, and a restriction against maintaining
25 "awkward or stationary neck positions," on October 3, 2002.  Id.
26 at 250.  Dr. Brett stated Plaintiff "should not be working as a
27 grocery checker."  Id.

28

-14-

Plaintiff moved from Portland, Oregon, to Arizona, in October of 2002.  See id. at 7.

On October 17, 2002, Plaintiff filed a Reconsideration Disability Report with the Social Security Administration, stating that she had increased pain and fatigue since her original application for benefits, filed in June of 2002.  Id. at 89.  At that time, Plaintiff stated that she suffered from an additional illness, i.e., depression.  Id.  On the list of physicians to provide medical records to the Social Security Administration with regard to the additional illness stated in her reconsideration report, Plaintiff did not list a psychiatrist or psychologist.  Id. at 90.

Plaintiff was treated by Dr. Sampson, a medical doctor in the Phoenix area, from at least November 2002 through July 2003.  Id. at 296-373.  Dr. Sampson noted on November 20, 2002:

> The patient ... has a history of asthma, wheezing, allergy problems. ...  She has a history of fibromyalgia since 1989.  She was doing OK with this, doing yoga and doing fine until 2001.  She crushed one of her arms.  She had C7 cord compression because of the accident.  Since then, her hands have shaken.  She has a problem raising her hands.  The whole back hurts....  She has seen a neurologist and had lots of tests.  They even considered possibility of whether or not she had MS and that was looked into also.  She has had problems with slurring of her speech and memory problems.  This was there a little bit before the accident....  On bad days, she even has a hard time opening her eyes.  She continues with her yoga every day.  She has had physical therapy and it didn't really help.  Problems sleeping at times but this has gone on since childhood.

Id. at 297.

Dr. Sampson assessed Plaintiff as suffering from fibromyalgia, for which he recommended exercise, but he noted

-15-

that he might potentially prescribe Oxycontin for this condition.  Id.  Dr. Sampson also opined Plaintiff suffered from irritable bowel syndrome, asthma (for which he intended to prescribe "different" treatment), and allergic rhinitis, for which he prescribed Breathe Right nasal spray.  Id. at 297.  Dr. Sampson noted it was "unusual" for Plaintiff to still be displaying whiplash-type symptoms from the automobile accident, stating: "It is difficult to judge how much is her fibromyalgia and how much is secondary to whiplash.  In either case, there is not much more that physical therapy or injections could do at this time... Anti-inflammatories and possibly anti-depressants in the future."  Id. at 298.  Dr. Sampson did not, apparently, see Plaintiff's prior medical records prior to making this assessment.  Id.  On November 22, 2002, Dr. Sampson opined Plaintiff "will have chronic low back pain which will be permanent and moderate disability."  Id. at 301.

In February of 2003, Plaintiff completed a Disability Report, stating that her inability to work was caused by fibromyalgia, musculoskeletal arthritis, memory loss, asthma, constant sinus and bronchial infections, and poor lung function. Plaintiff stated her ability to work was compromised because she "can't breath, spinal bone grafts & plates.  Spine degenerative disease [collapsing] do not sit, stand, or lay well or breath at any time."  Id. at 94.  Plaintiff alleged that these problems caused her to be unable to work as of May 8, 2001, the date of her car accident.  Id.  Plaintiff indicated that her job attendance had "been poor for 10 years and unable to work from further spine [injuries] on May 8, 2001."  Id.  Plaintiff

further asserted her previous job as a grocery cashier required her to lift approximately 30 to 150 pounds every 30 seconds bending from the floor to over her head.  Id. at 95.

Plaintiff also stated that, as of February of 2003, she had never been seen by any physician for an emotional or mental problem that limited her ability to work.  Id. at 96.  At that time, the only physician Plaintiff was seeing was Dr. Sampson. Plaintiff indicated she had not seen Dr. Dougherty since August 2002, and that she last saw her surgeon, Dr. Brett, in October 2002.  At that time, Plaintiff listed her medications as Advair, Allegra, Lipitor, Cyclobenzapine, Zoloft (prescribed by Dr. Sampson), propoxyphene and morphine.

Plaintiff completed an activities of daily living questionnaire on March 25, 2003.  Id. at 107-110.  Plaintiff stated she did not sleep well.  Id. at 107.  Plaintiff reported she was able to watch television and play computer games, go for a short walk, and bathe, on a daily basis.  Plaintiff stated she was unable to clean because she could not reach her arms up or backward and she could not lift more than 10 pounds.  Plaintiff stated she needed heavy drugs to control her pain from the fibromyalgia and her neck and back conditions.

Plaintiff stated her ex-husband lived with her "off and on," and that her adult daughter lived with her "off and on." Id. at 108.  Plaintiff's parents live close to Plaintiff.  Id. at 108-09.  Plaintiff stated she could cook her own meals, i.e., hot dogs, sandwiches, macaroni and cheese, and raw vegetables, by using a microwave.  Id. at 108.  Plaintiff stated she could not do any household chores without assistance and could not

shop without assistance.  Id.  Plaintiff maintains contact with her family.  Id.  Plaintiff does not state anywhere in her activities of daily living questionnaire that she is limited by any mental inability or depression.

On March 28, 2003, Dr. Libby, a pulmonary specialist and treating physician, to whom Plaintiff was referred by Dr. Dougherty, completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" regarding Plaintiff's condition from May of 2001 through January of 2002.  Id. at 279-80.  Dr. Libby stated he last saw Plaintiff on May 31, 2001. Id. at 280.  Dr. Libby diagnosed Plaintiff as suffering from asthma and musculoskeletal pain.  Id.  Dr. Libby stated Plaintiff had no lifting and carrying restrictions, and that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds.  Id. at 279.  Dr. Libby opined Plaintiff could stand or walk about six hours in an 8-hour workday, and that she could sit six hours in an 8-hour workday.  Id.  Dr. Libby opined Plaintiff did not need to alternate standing and sitting.  Id. at 280.

Dr. Sampson, a non-specialist treating physician, completed a Medical Source Statement regarding Plaintiff's physical ability to do work-related activities on April 1, 2003, regarding Plaintiff's abilities after November of 2002.  Dr. Sampson stated Plaintiff could not lift 10 pounds or more.  Id. at 308.  Dr. Sampson stated Plaintiff could stand or walk less than two hours in an 8-hour workday.  Id.  Dr. Sampson stated Plaintiff could sit 2-3 hours in an 8-hour workday, and that she would need to alternate standing and sitting.  Id. at 309.

-18-

1    The Arizona Department of Economic Security Disability
2 Determination Services Administration requested an independent
3 medical examination of Plaintiff, performed by Dr. Butterbaugh,
4 who examined Plaintiff on June 24, 2003, and reviewed her
5 medical records.  Id. at 322-29.  Dr. Butterbaugh diagnosed
6 Plaintiff as suffering from cervical disc disease, fibromyalgia,
7 asthma, and irritable bowel syndrome.  Id. at 327.  Dr.
8 Butterbaugh opined that Plaintiff could perform work at the
9 sedentary exertional level, i.e., that Plaintiff could
10 occasionally or frequently lift 10 pounds, that Plaintiff could
11 stand and walk at least two hours in an 8-hour workday, that
12 Plaintiff could sit six hours in an 8-hour workday, and that
13 Plaintiff would not need to alternate sitting and standing.  Dr.
14 Butterbaugh opined that Plaintiff could only occasionally climb,
15 balance, stoop, kneel, crawl or crouch, and that Plaintiff was
16 limited with regard to heights and moving machinery.  Id. at
17 328-29.

18    Plaintiff was examined by a psychologist, Dr. Young, on
19 June 26, 2003.  Id. at 338-43.  Plaintiff reported to the doctor
20 that she had applied for disability based on "having memory
21 problems, fibromyalgia, asthma, and possible multiple
22 sclerosis."  Id. at 338.  Plaintiff told the doctor she had high
23 cholesterol, fibromyalgia, irritable bowel syndrom, and asthma.
24 Plaintiff told the doctor she had "'no immune system,'" and a
25 "'spinal cord injury.'"  Id. at 341.  Plaintiff told the doctor
26 that she had not previous been in counseling or sought
27 psychiatric help.  Id.

28

Dr. Young, an examining specialist, estimated Plaintiff's cognitive functioning ability as average. _Id._ at 339. The doctor reported Plaintiff had "excellent problem-solving strategies and approaches." _Id._ Dr. Young concluded that Plaintiff functioned

> in the low average range with regard to her general memory functioning and immediate memory function. It is slightly below her expected level of performance as measured by her WAIS-III. It does suggest that she may have some weaknesses with regard to memory function. Her attention and concentration were in the average range.

_Id._ at 340. Plaintiff reported difficulty sleeping, feeling fatigued, and no longer enjoying previously pleasurable activities. _Id._ Plaintiff reported feeling worthless and helpless, but not hopeless. _Id._ Plaintiff reported being worried about her finances, and that she felt frustrated. _Id._ Plaintiff told the doctor she spent her days watching television. _Id._ at 341. The doctor stated:

> Given her conditions of fibromyalgia, it is possible that she has mood difficulties related to her medical condition. She does not have symptoms consistent with [] major depression. She has no psychotic process affecting her. Her cognitive development seems to be within the average range. She does have some minor weaknesses with regard to memory [;] her overall memory function is like that [of] a person with low average ability. She may have some mood difficulties related to her medical condition. She may be very discouraged and her lethargy is compounding her feelings of low self-esteem.

_Id._ at 342. This doctor concluded:

> Given her current test results, she should be able to understand simple directions presented to her. She should be able to follow through with instructions that she understands what she was supposed to be doing. At the present time, she is a person

-20-

> who may have difficulty with interacting with
> supervisors and coworkers due to her self-
> esteem issues.     Stress  is  likely  to
> exasperate  her  condition.    Her  judgment
> appears  to  be  within  the  normal  limits.
> Emotionally, she is relatively stable.   She
> may not be very reliable in a work setting.

Id. at 342.

A Department of Disability Services physician completed a residual functional capacity assessment of Plaintiff in July of 2003.   Id. at 330-37.   The assessment concluded Plaintiff could perform work at the light exertional level.   However, the assessment does not indicate what evidence or medical records were reviewed or provide the basis for the doctor's opinion, referring to "6E," and the signature on the assessment is not legible.   This physician was a reviewing physician who did not examine Plaintiff.

In July 2003, a psychologist, Dr. Enos, who did not examine or treat Plaintiff, completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment form regarding Plaintiff's mental condition.   Id. at 344-61.   Dr. Enos reviewed the clinical findings of Dr. Young, who had examined Plaintiff.    Dr. Enos concluded Plaintiff suffered from a mood disorder secondary to medical conditions. Id. at 347.   Dr. Enos concluded Plaintiff had mild restrictions of activities of daily living, difficulties maintaining social functioning, difficulty maintaining concentration, persistence, and pace.   Id. at 354.   Regarding Plaintiff's residual mental functional  capacity,  Dr.  Enos  concluded  Plaintiff  was  not significantly limited in any mental functioning category, and that she could carry out simple instructions and complete a

-21-

routine work week.  Id. at 360.

In September of 2003, Dr. Sampson, Plaintiff's treating physician, completed a Medical Source Statement of Plaintiff's ability to do work-related activities.  Id. at 375.  Dr. Sampson concluded Plaintiff could only occasionally lift more than ten pounds, that she could not stand or walk more than two hours in an 8-hour workday, that she  could sit for 2-3 hours in an 8-hour workday, and that she needed to alternate standing and sitting.  The doctor opined Plaintiff could only rarely stoop or kneel, and that she could never crouch or crawl.  Id. at 376. The doctor stated that Plaintiff had job restrictions regarding heights, moving machinery, temperature extremes, chemicals, and dust.  Id.  Dr. Sampson stated Plaintiff suffered from fibromyalgia, irritable bowel syndrome, and asthma.  Id.

A November 2003, MRI of Plaintiff's left shoulder produced findings "most consistent with tendinosis or tendinitis.  Id. at 406.

In January of 2004 Plaintiff was seen by Dr. Root, a neurologist, for a consultation.  Id. at 381.  Dr. Root reviewed Plaintiff's neurological medical records.  Id. at 382.  Dr. Root noted Plaintiff complained of "severe neck and left arm pain with numbness, which has emerged in the past year."  Id. at 381. The doctor stated she should be referred to a neurosurgeon for an opinion and "to follow-up with her pain management specialist for ongoing conservative and symptomatic care.  There is no need for any further neurological follow-up."  Id. at 382.  The doctor noted:

> Motor tone and strength examination is normal in the right upper and both lower

> extremeties.   In the left upper extremity
> there is variable collapsing or give way type
> of   weakness,   depending   upon   the   pain
> experienced in the limb... Gait is mildly
> antalgic moving slowly and gingerly because
> of weight bearing discomfort in the low back
> region. ... Lumbar spine range of motion is
> normal in all directions.   However, there is
> guarding of movement initially because of
> pain perceived. ...

Id. at 384.

Plaintiff was referred to Dr. Khayata, a neurosurgeon, by her consulting neurologist, Dr. Root, and her neurosurgeon, Dr. Brett.   Id. at 402.   Plaintiff was examined by Dr. Khayata on March 10, 2004.   Id.

> She has continued to experience neck pain and
> numbness in both upper extremities.   She does
> not have any shooting pain, but she is
> experiencing some numbness.   She has a
> history of fibromyalgia.  NO weakness.
> An MRI of the cervical spine was obtained by
> Dr. Kenneth Root and this revealed evidence
> of a previous fusion.   There were no abnormal
> findings at C5-6.   There was a finding at the
> C6-7 level, which may represent a small disc
> protrusion versus osteophyte.   She is now
> referred for further evaluation.

Id.   Dr. Khayata recommended physical therapy for Plaintiff's neck and back pain, and suggested Dr. Root order nerve conduction studies.   Id. at 403.   Dr. Khayata advised against heavy lifting.   Id.

Approximately six months after he completed his September 2003 assessment, Dr. Sampson completed a residual functional capacity assessment specifically regarding the effect of Plaintiff's pain on her ability to work.   Id. at 365.   On March 15, 2004, Dr. Sampson assessed Plaintiff's pain level as moderately severe and secondary to her fibromyalgia.   Id. at 365.   Dr. Sampson opined Plaintiff's pain constantly interfered

with her concentration and attention and that she could not complete tasks in a timely manner.  <u>Id.</u> at 366.  The notes state Plaintiff's pain was moderate at times and severe at other times.  <u>Id.</u> at 365.  Dr. Sampson stated Plaintiff's pain was "always severe if she pushes to do too much."  <u>Id.</u>  Regarding the basis for his findings, Dr. Sampson stated that "potentially" some of Plaintiff's degree of pain could reasonably be expected to result from objective clinical or diagnostic findings, "but some of it is secondary to fibromyalgia."  <u>Id.</u>  Dr. Sampson noted Plaintiff's pain was precipitated by a static position, changing weather, overuse, stress, cold and heat.  <u>Id.</u> at 366.  Dr. Sampson also concluded Plaintiff's experience of pain was constantly sufficiently severe to interfere with her attention and concentration, and that she was constantly experiencing deficiencies of concentration, persistence or pace as a result of her pain.  <u>Id.</u> at 366.

Dr. Sampson also completed an additional medical assessment of Plaintiff's physical residual functional capacity on March 30, 2004.  <u>Id.</u> at 367.  Dr. Sampson concluded Plaintiff could not sit, stand or walk for one hour at a time in an 8-hour workday, that she could sit for three hours and stand for three hours in an 8-hour workday if she could frequently change position, and that she could walk for two hours in an 8-hour workday.  <u>Id.</u>  Dr. Sampson concluded Plaintiff could occasionally lift 5 pounds but never more than that, and that she could never carry any weight at all.  <u>Id.</u>  Dr. Sampson concluded Plaintiff could never bend, squat, stoop, crawl or

climb, but that she could occasionally reach. _Id._ at 368. Without explanation, in contrast to his opinion six months earlier, Dr. Sampson concluded Plaintiff had no restrictions with regard to heights, machinery, exposure to changes in temperature and humidity, or exposure to dust, fumes, and gases. _Id._ at 368.

In April of 2004, Plaintiff listed her medications as Cephalexin for skin lesions, Maxair and Advair for asthma, Tramadol, morphine, and methadone for pain, cyclobenzaprine for muscle spasms, and Alllegra D for allergies. _Id._ at 136. Plaintiff reported side effect of these medications as nausea, shaking, drowsiness and dizziness, hives, dry skin and bleeding. _Id._

At the hearing before the ALJ on April 14, 2004, Plaintiff testified she attempted to work after the May 2001 car accident and after her first cervical vertebrae surgery, but that she discontinued work in July of 2002 because work became too difficult. _Id._ at 422.[3] Plaintiff testified she suffered pain in her neck, down her back, and across her shoulders. _Id._ at 424. She testified she could only sit, stand, or walk for one-half hour at a time, and that she became numb if she occupied one position for "too long." _Id._ at 425. Plaintiff testified that memory loss, pain, and incontinence prevented her from keeping a steady job. _Id._ at 424. Plaintiff stated she spent about three hours total lying down during a typical 8-hour

---

[3] The record includes fifteen paycheck stubs dated from March 1, 2002, through July 26, 2002, indicating Plaintiff worked approximately 30 to 40 hours per week during this time period, although some weeks she worked fewer than 30 hours. _See_ R. at 74-88. Plaintiff testified she worked about 25 hours per week. _Id._ at 423.

day.  Id. at 432.  Plaintiff testified she depended on relatives for help with her housework and to prepare meals.  Id. at 429-30.  Plaintiff testified she did not feel that her asthma was "independently disabling."  Id. at 428.

A vocational expert ("VE") testified at the hearing. The vocational expert testified that, assuming the limitations as assessed by Dr. Butterbaugh, the physician who performed an independent medical examination of Plaintiff at the behest of the state disability services department, regarding Plaintiff's physical residual functional capacity,[4] Plaintiff could perform the sedentary unskilled jobs of cashier, assembler, and addresser.  Id. at 439.  When asked if a need to alternate sitting and standing were added to the previous restrictions found by Dr. Butterbaugh, the VE testified that, assuming a need to alternate sitting and standing, Plaintiff could perform the jobs of cashier and assembler.  Id. at 439-40.  The VE also testified Plaintiff could perform these jobs even with the restriction imposed by Dr. Enos, the reviewing psychiatrist,

_____

[4] Dr. Butterbaugh's residual functional capacity assessment of Plaintiff states that Plaintiff could occasionally or frequently lift 10 pounds, that Plaintiff could stand and walk at least two hours in an 8-hour workday, that Plaintiff could sit six hours in an 8-hour workday, and that Plaintiff would not need to alternate sitting and standing.  Dr. Butterbaugh opined that Plaintiff could only occasionally climb, balance, stoop, kneel, crawl or crouch, and that Plaintiff was limited with regard to heights and moving machinery. This residual functional capacity was the same as that assessed by the Portland pulmonary specialist who treated Plaintiff's asthma, Dr. Libby.  This is the same residual functional capacity also found by the reviewing, non-examining, non-treating physician who completed the residual functional capacity assessment at 15F in the record before the ALJ.

Dr. Brett, Plaintiff's treating neurosurgeon in Portland, had previously released her for "light work," with a lifting restriction, a restriction on heavy exertion, and a restriction against maintaining "awkward or stationary neck positions," on October 3, 2002. R. at 250. Dr. Brett stated Plaintiff "should not be working as a grocery checker."  Id.

-26-

i.e., that Plaintiff could only perform work with simple instructions. Id. at 440.  When asked if an individual with the limitations specified by Dr. Sampson, one of Plaintiff's treating physicians, could work, the expert stated that no work would be available.  Id. at 441.

At the hearing, Plaintiff's counsel requested an amendment to the alleged onset date of disability to June 30, 2002, which amendment was granted.  Id. at 22.  Subsequent to the hearing, additional exhibits were admitted into the record. Id. at 22.[5]

In a written opinion issued October 29, 2004, the ALJ concluded Plaintiff's asthma, herniated nucleus puposus with spondylosis requiring two different surgeries, history of fibromyalgia syndrome, and irritable bowel syndrome were "severe" impairments as defined by 20 C.F.R. § 404.1520(c), but that the impairments did not meet or medically equal one of the listed impairments.  Id. at 29.

In the written opinion denying benefits, the ALJ stated:

> Based on the total record, the undersigned finds the claimant's subjective complaints, including complaints of pain, are exaggerated and less than totally credible.
> The Administrative Law Judge finds the claimant's subjective complaints are disproportionate to the objective medical evidence.  Her physical problems have improved when she has received appropriate

---

[5] The Court notes that evidence of disability occurring or increasing in severity subsequent to the expiration of the claimant's insured status is relevant and properly evaluated to address the question of whether the claimant was disabled during the period of their insured status.  See Sampson v. Chater, 103 F.3d 918, 922 (9th Cir. 1996); Smith v. Bowen, 849 F.2d 1222, 1225-26 (9th Cir. 1988).

medical treatment, i.e. surgery on her
cervical spine. She returned to work after
her first cervical surgery. She worked until
June 2002. Since her second back surgery in
August 2002, the claimant has declined to
seek work of any kind, despite the fact that
her treating neurosurgeon, Dr. Brett,
determined she could lift/carry up to 25
pounds in October 2002, and the limitation
was considered temporary [].

Although the claimant complains of
paresthesias with minor hand and head
movement [], the claimant lives alone and she
is able to meet her personal needs. She is
able to cook her own meals and goes grocery
shopping. The claimant does some household
chores and plays computer games []. Her
mother reported that the claimant spends time
with her family and gets along with other
people as well []. The claimant took a trip
to Sedona during the adjudicatory period and
she flew from Portland, Oregon to Phoenix in
September 2002. she does use a significant
amount of pain medication, which is
apparently effective. Such daily activities
do not suggest the claimant is totally
disabled.

Id. at 26.

The ALJ further stated:

Several of the claimant's treating physicians
have provided medical source statements on
the claimant's physical condition. The
residual functional capacity assigned to the
claimant by Ronald Sampson, M.D. in exhibits
21F, 22F, and 24F is given very limited
weight, however. Dr. Sampson is not an
orthopedic specialist. Moreover, the doctor
indicated that some of the assigned
limitations were due to the claimant's
fibromyalgia. Such limitations are clearly
difficult to quantify. Dr. Sampson reported
that the claimant's level of pain is "severe"
if she "pushes" herself, but the doctor does
not define what work-related activities would
cause the claimant to push herself. He did
state exacerbating factors are movement and
overuse, which is consistent with assigned
residual functional capacity. Additionally,
Dr. Sampson's medical opinions are not
consistent with the medical opinions of the
other doctors who have assessed the
claimant's physical residual functional
capacity, including a pulmonary specialist,

-28-

Dr. Libby, and her treating neurosurgeon, Dr. Brett, and the consulting neurosurgeon, Dr. Khayata.

Id. at 27.

The ALJ assigned "substantial weight" to the medical opinion of Department of Disability Services physician, dated July 9, 2003, at exhibit 15F in the record, and Dr. Enos, who completed a psychiatric review technique form in July of 2003, at exhibit 17F in the record, stating: "These assessments by the State agency medical consultants are consistent with the great weight of the evidence of record." Id.

The ALJ concluded Plaintiff had the residual functional capacity to sit for up to 6 hours in an 8-hour workday. Id. at 27. The ALJ determined Plaintiff retained the residual functional capacity for sedentary work, with a "sit/stand option every 30 minutes" and a limitation to "simple work." Id. at 27-28. The ALJ stated: "She is restricted to simple work tasks due to the effects of pain and inability to concentrate on more complex tasks due to pain and drowsiness from pain medications." Id. at 28. The ALJ further concluded that, although Plaintiff could not return to her past relevant work as a grocery store checker, which required standing and lifting and was thus not categorized as sedentary labor, she could perform other jobs existing in the national economy, i.e., as an unskilled cashier at the "sedentary" level of exertion, or as an assembler. Id. at 29.[6]

---

[6] The vocational expert testified that the job of grocery store cashier is classified as light exertional and semi-skilled labor. R. at 438. The vocational expert testified that, as described by Plaintiff, her job as a grocer store cashier was at the medium exertional level. Id. The

In his written opinion finding Plaintiff not disabled and denying benefits, the ALJ stated:

> The vocational expert testified that assuming the hypothetical individual's specific work restrictions, she is capable of making a vocational adjustment to unskilled, sedentary work.  [The expert] further testified that given all of these factors the claimant could work as a cashier and assembler, as these positions are described in the Dictionary of Occupational Titles [].   The vocational expert noted that these jobs are found ... in the local and national economy...

Id.

**V  Analysis**

**1. Plaintiff contends that the ALJ erred by finding that her mental impairment was not severe.**

At step two of the sequential analysis, the ALJ assesses whether the claimant has a medically severe impairment or combination of impairments which significantly limit her ability to do basic work activities.  See 20 C.F.R. § 404.1520(a)(4)(ii) (2005).  A medically severe ailment may be a mental ailment.  See, e.g., Giese v. Barnhart, 55 Fed. App. 799, 801 (9th Cir. 2002).  The "ability to do basic work activities" is defined as "the abilities and aptitudes necessary to do most jobs."  Id. § 404.1521(b).  An impairment or combination of impairments is per se not severe if the record evidence establishes the claimant suffers from only a slight abnormality that has "no more than a minimal effect on [the claimant's] ability to work."  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (internal quotations omitted).  If the ALJ finds that the

---

vocational expert testified that, essentially, the job of "sedentary cashier," was classified as sedentary exertional level and unskilled.  Id. at 439, 442-43.

claimant lacks a medically severe impairment, the ALJ must find the claimant to be not disabled; however, if the ALJ concludes the claimant does have a medically severe impairment, the ALJ proceeds to the next steps in the sequence.   See id.

Step two is considered "a de minimis screening device [used] to dispose of groundless claims." Smolen, 80 F.3d at 1290; Webb, 433 F.3d at 687.[7]  An ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is "clearly established by medical evidence." Webb, 433 F.3d at 686-87.

The ALJ concluded Plaintiff's physical ailments of asthma, herniated nucleus puposous with spondylosis requiring two different surgeries, fibromyalgia, and irritable bowel syndrome, were "severe" impairments.   R. at 29-30.   The ALJ did not conclude Plaintiff's mood disorder or depression was a "severe" impairment.

---

[7]

Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe." According to the Commissioner's regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 404.1521(a)(1991). Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." 20 C.F.R. § 140.1521(b); [].

Important here, at the step two inquiry, is the requirement that the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe. [] Also, he is required to consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity. [] Finally, the step-two inquiry is a de minimis screening device to dispose of groundless claims.

Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).

To resolve Plaintiff's claim regarding this finding, the Court must first determine "whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the plaintiff] did not have a medically severe impairment or combination of impairments." Webb, 433 F.3d at 687, citing Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.").

There is substantial evidence (more than a scintilla of evidence and enough evidence that a reasonable mind would accept it as adequate) to support the ALJ's finding that the medical evidence established Plaintiff's mental disorder was not a "severe" impairment. See Ukolov v. Barnhart, 420 F.3d 1002, 1006 (9th Cir. 2005); Bowser v. Commissioner of Soc. Sec., 121 Fed. App. 231, 237-38 (9th Cir. 2005). Compare Webb, 433 F.3d at 687-88. The evidence in the record supports the conclusion Plaintiff's mood disorder had no more than a minimal effect on Plaintiff's ability to work. An examining psychiatrist and reviewing psychiatrist opined Plaintiff's mood impairment was secondary to her medical conditions, which the ALJ concluded were "severe." Neither psychologist concluded Plaintiff's mental condition would preclude her ability to work. No psychiatrist or other physician concluded Plaintiff's mental condition would preclude her ability to work. Plaintiff did not report being affected by a mood disorder or depression prior to the alleged date that she became unable to work due to her asthma and musculoskeletal ailments. Plaintiff did not seek any

mental health assistance from counseling or a psychologist prior to, or after, raising her mood disorder as a basis for disability benefits.  The only evidence in the record indicating Plaintiff's mood disorder might possibly affect her ability to work was Dr. Young's statement that Plaintiff might be "unreliable" in a work setting.

There is ample evidence in the record from which the ALJ could properly conclude Plaintiff's mood disorder did not affect her ability to work, including her doctors' repeated comments that Plaintiff appeared alert and oriented, and her failure to report mental problems to her physicians. Additionally, the Court notes that the ALJ continued past step two of the sequential process, and that the ALJ did consider Plaintiff's mood disorder limitations, including those potentially caused or exacerbated by her medical conditions and medications, when assessing her residual functional capacity at step four of the sequential process.  See Bowser, 121 Fed. App. at 237.

**2. Plaintiff contends the ALJ erred at step four of the sequential process by failing to properly credit the opinion of Plaintiff's treating and examining physicians.**

At step four of the five-step sequential process used to determine if a claimant is "disabled," the ALJ must examine the claimant's "residual functional capacity and the physical and mental demands" of the claimant's past relevant work.  20 C.F.R. §§ 404.1520(e) & 416.920(e) (2005).  To find that the claimant is not disabled at step four, the claimant must be able to perform: (1) the actual functional demands and job duties of a particular past relevant job; or (2) the functional demands

-33-

and job duties of an occupation as generally required by employers throughout the national economy. <u>Pinto</u>, 249 F.3d at 844-45. In denying a claimant at step four of the five-step sequential process used to determine if a claimant is disabled, the ALJ has a duty to make the requisite factual findings to support her conclusion. <u>See id.</u> at 844.

Title II's implementing regulations distinguish among the opinions of three types of physicians: (1) those who treat the claimant (the "treating" physicians); (2) those who examine but do not treat the claimant (the "examining" physicians); and (3) those who neither examine nor treat the claimant, but who review the claimant's file (the "nonexamining" or "reviewing" physicians). <u>See</u> 20 C.F.R. § 404.1527(d) (2005); <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, in determining whether a claimant is disabled, i.e., in assessing a claimant's residual functional capacity, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's. <u>See</u> 20 C.F.R. § 404.1527(d) (2005); <u>Lester</u>, 81 F.3d at 830. Additionally, the Social Security Administration regulations instruct adjudicators to give greater weight to opinions which are explained than to those which are not explained, <u>see</u> 20 C.F.R. § 404.1527(d)(3) (2005), and to the opinions of specialists concerning matters relating to their specialty over those of nonspecialists. <u>See id.</u> § 404.1527(d)(5). <u>See also</u> <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1201-02 (9th Cir. 2001).

> An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record. <u>Reddick v. Chater</u>, 157 F.3d 715, 725 (9th Cir. 1998) ... If the treating physician's medical opinion is inconsistent with other substantial evidence in the record, "[t]reating source medical opinions are still entitled to deference and must be weighted using all the factors provided in  20 CFR § 404.1527." SSR 96-2p.

<u>Holohan</u>, 246 F.3d at 1201-02.

When there is a conflict between the opinions of a treating physician and examining physicians the ALJ may disregard the opinion of the treating physician only if his specific and legitimate reasons for doing so are supported by substantial evidence in the record. <u>Lester</u>, 81 F.3d at 830. The ALJ can meet this burden of substantial evidence by "providing a detailed summary of the facts and conflicting clinical evidence, along with a reasoned interpretation thereof." <u>Rodriguez v. Bowen</u>, 876 F.2d 759, 762 (9th Cir. 1989). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his analysis, but "cannot reject evidence for no reason or for the wrong reason." <u>Morales v. Apfel</u>, 225 F.3d 310, 316 (3d Cir. 2000).

> When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given. <u>See</u> <u>id.</u> § 404.1527(d)(4). ... the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative.

-35-

<u>Snell v. Apfel</u>, 177 F.3d 128, 133 (7th Cir. 1999).

> "[A] treating source's opinion on the issue(s) of the nature and severity of your impairment(s)" will be given "controlling weight" <u>if</u> the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(d)(2).

<u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003) (emphasis added).

Additionally, it is the ALJ's responsibility to determine whether there are internal inconsistencies in a physician's report, whether those inconsistences are material, and whether other relevant factors support discounting the physician's opinion. <u>See</u> <u>Morgan v. Commissioner of the Soc. Sec. Admin.</u>, 169 F.3d 595, 603 (9th Cir. 1999). An ALJ may reject all or part of an examining physician's report if it contains inconsistencies, is conclusory, or is inadequately supported. <u>See</u> <u>id.</u>; <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002).

When determining Plaintiff's residual functional capacity, the ALJ stated:

> The residual functional capacity assigned to the claimant by Ronald Sampson, M.D.[] is given very limited weight, however. Dr. Sampson is not an orthopedic specialist. Moreover, the doctor indicated that some of the assigned limitations were due to the claimant's fibromyalgia. Such limitations are clearly difficult to quantify. Dr. Sampson reported that the claimant's level of pain is "severe" if she "pushes" herself, but the doctor does not define what work-related activities would cause the claimant to push herself. He did state exacerbating factors are movement and overuse, which is consistent with assigned residual functional capacity. Additionally, Dr. Sampson's medical opinions are not consistent with the medical opinions of the other doctors who have assessed the claimant's physical residual functional

capacity, including a pulmonary specialist,
Dr. Libby, and her treating neurosurgeon, Dr.
Brett, and the consulting neurosurgeon, Dr.
Khayata.

Id. at 27.

The ALJ possibly erred in assigning "substantial weight" to the medical opinion of the physician who completed a peremptory Residual Functional Capacity assessment with no notations as to what specific records he had consulted or on what specific basis his opinion was formed. To the extent the ALJ gave more weight to this opinion than to others in the record, the ALJ did not commit reversible err in determining that this assessment of Plaintiff's physical residual functional capacity was "consistent with the great weight of the evidence of record." See, e.g., Humphreys v. Barnhart, 127 Fed. App. 73, 76, 104 Soc. Sec. Rep. Serv. 219 (3d Cir. 2005). Compare Wilson v. Commissioner of Soc. Sec., 378 F.3d 541, 547-48 (6th Cir. 2004). With the exception of Dr. Sampson, none of Plaintiff's other treating and examining physicians, including Dr. Brett (treating), Dr. Libbey (treating), Dr. Dougherty (treating), and Dr. Butterbaugh (examining), opined that Plaintiff was incapable of at least sedentary labor. The Court notes that, on November 27, 2002, approximately six months after Plaintiff alleged her medical problems were so severe she could not work, Dr. Sampson did not prescribe for Plaintiff either pain medication for her musculoskeletal pain or an anti-depressant for her depression. It is not clear from Dr. Sampson's assessments of Plaintiff's functional capacity the extent to which he concluded she could not work because of her asthma. There is no evidence in the

record that Plaintiff's asthma precluded her ability to perform sedentary labor.  Additionally, at that time, Dr. Sampson opined Plaintiff suffered from only "moderate" disability.  The ALJ's opinion could arguably have been more thorough in discussing the entirety of the medical evidence in the record.  However, as a matter of law, the ALJ gave sufficient specific and legitimate reasons for discounting the opinion of a single treating physician, Dr. Sampson, and giving greater weight to the opinions of Plaintiff's other treating physicians and the reviewing and examining physicians.  The specialist who treated Plaintiff for her back pain, Dr. Brett, concluded Plaintiff could perform work at the sedentary exertional level, i.e., "light work," with a lifting restriction, a restriction on heavy exertion, and a restriction against maintaining "awkward or stationary neck positions."  R. at 250.  The findings of these physicians are supported by the medical evidence and clinical findings in the record.  There are no consistent clinical findings in the record from which Dr. Sampson could authoritatively conclude Plaintiff was completely disabled.  See Thomas, 278 F.3d at 957 (holding that an ALJ may reject a medical opinion if it is conclusory and inadequately supported by clinical findings).

As mentioned supra, the ALJ could have given a more detailed summary of the facts and conflicting clinical evidence regarding Plaintiff's limitations, along with the reasoned interpretation of the differences in Doctor Sampson's opinion and the opinions of the other physicians.  However, the ALJ's conclusion is supported by substantial evidence in the record,

i.e., more than a scintilla of evidence and sufficient evidence that a reasonable mind would accept it as supporting the conclusion.   The ALJ gave clear and convincing reasons supported by the entire record for rejecting Dr. Sampson's opinion and, therefore, he did not err as a matter of law by discounting Dr. Sampson's opinion.   See Morgan, 169 F. 3d at 602 ("we have consistently upheld the Commissioner's rejection of the opinion of a treating or examining physician, based in part on the testimony of a nontreating, nonexamining medical advisor.").

**3.    Plaintiff alleges the ALJ erred by failing to credit Plaintiff's testimony regarding her disabling symptoms.**

An ALJ must provide "specific, cogent reasons," supported by substantial evidence in the record, for her disbelief of a claimant's statements regarding the claimant's disability.  Lester, 81 F.3d at 834; Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991).  See also Jernigan v. Sullivan, 948 F.2d 1070, 1073 (8th Cir. 1991).   Unless there is affirmative evidence indicating the claimant is actually malingering, the ALJ's reasons for rejecting the claimant's testimony must be clear and convincing.  See Lester, 81 F.3d at 834; Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989). The ALJ must specifically identify what portion of the testimony in the record is credible and what testimony undermines the claimant's complaints.  See Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).   "To find the claimant not credible the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct, or on internal contradictions in that testimony."

-39-

Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

> To determine whether the claimant's testimony regarding the severity of her symptoms is credible, the ALJ may consider, for example: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. In evaluating the credibility of the symptom testimony, the ALJ must also consider the factors set out in [Social Security Ruling] 88-13.

Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (internal citations omitted).

An ALJ may not discredit a claimant's testimony regarding her pain and resulting fatigue "solely because the degree of pain alleged by the claimant is not supported by objective medical evidence." Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (citing Bunnell, 947 F.2d at 346-47). See also Social Security Ruling 96-7p, 61 Fed. Reg. 34483, 34485 (July 2, 1996) ("An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.").

With regard to Plaintiff's credibility concerning her disabling symptoms, the ALJ stated:

> Based on the total record, the undersigned finds the claimant's subjective complaints, including complaints of pain, are exaggerated and less than totally credible.
> The Administrative Law Judge finds the claimant's subjective complaints are disproportionate to the objective medical

evidence. Her physical problems have
improved when she has received appropriate
medical treatment, i.e. surgery on her
cervical spine. She returned to work after
her first cervical surgery. She worked until
June 2002. Since her second back surgery in
August 2002, the claimant has declined to
seek work of any kind, despite the fact that
her treating neurosurgeon, Dr. Brett,
determined she could lift/carry up to 25
pounds in October 2002, and the limitation
was considered temporary [].
Although the claimant complains of
paresthesias with minor hand and head
movement [], the claimant lives alone and she
is able to meet her personal needs. She is
able to cook her own meals and goes grocery
shopping. The claimant does some household
chores and plays computer games []. Her
mother reported that the claimant spends time
with her family and gets along with other
people as well []. The claimant took a trip
to Sedona during the adjudicatory period and
she flew from Portland, Oregon to Phoenix in
September 2002. [S]he does use a significant
amount of pain medication, which is
apparently effective. Such daily activities
do not suggest the claimant is totally
disabled.

Id. at 26.

Because the ALJ did not expressly find affirmative

evidence indicating Plaintiff was actually malingering, the

ALJ's reasons for rejecting her testimony must be clear and

convincing. Lester, 81 F.3d at 834. However, an ALJ is not

required to accept every symptom of which a claimant complains

as rising to the level of a functional limitation. See

Magallanes v. Bowen, 881 F.2d 747, 756-57 (9th Cir. 1989)

(stating an ALJ is free to accept or reject a claimant's

proposed restrictions as long as the decision is supported by

substantial evidence).

The ALJ examined the record in this matter and was

able to observe Plaintiff during the hearing and during her

testimony.    The  record  before  the  ALJ  contains  substantial

evidence  of  internal  inconsistencies  regarding  Plaintiff's

allegations  about  her  ailments  and  limitations,  including  the

fact  she  returned  to  work  after  asserting  that  she  was  no  longer

able  to  work.[8]   Although  the  record  could  support  a  conclusion

that  Plaintiff's  reports  of  disabling  pain  and  fatigue  were

credible,  the  record  also  contains  evidence  that  Plaintiff

repeatedly  over-reported  her  ailments  to  her  physicians  and  that

some  of  her  physicians  found  Plaintiff  not  entirely  credible  in

reporting  her  symptoms  and  limitations.

The  Court  notes,  again,  the  ALJ's  written  opinion  is

somewhat  sparse  in  this  regard,  but  not  so  sparse  as  to  warrant

reversal.  Even  if  the  record  permits  a  different  assessment  of

Plaintiff's  credibility,  the  Court  may  not  reverse  the  ALJ's

decision  unless  there  is  a  lack  of  substantial  evidence  to

support  the  ALJ's  decision,  and  the  Court  concludes  there  is

sufficient  evidence  in  the  record  to  reach  this  standard.   See

Thomas,  278  F.3d  at  959.   "Where  ...  the  ALJ  has  made  specific

findings  justifying  a  decision  to  disbelieve  an  allegation  ...

and  those  findings  are  supported  by  substantial  evidence  in  the

record,  our  role  is  not  to  second-guess  that  decision."   Morgan,

169  F.3d  at  600.

---

[8] The  Court  notes  Plaintiff  returned  to  work  after  her  first  surgery,
but  that  this  caused  her  pain  and  suffering  and  she  was  ultimately  forced
to  have  additional  surgery.   Plaintiff  filed  her  application  for  disability
benefits  after  her  return  to  work  after  her  first  surgery  and  before  her
second  surgery.   Plaintiff  did  not  attempt  to  work  after  her  second  surgery,
although  Dr.  Brett  opined  Plaintiff  could  return  to  "light"  work.

**4. Plaintiff contends the ALJ erred in accepting the vocational experts testimony about whether there were jobs in the national economy which Plaintiff could perform.**

If it is determined at step four that the claimant lacks the residual functional capacity to perform her former job, at step five of the sequential evaluation the Social Security Commissioner has the burden of showing the claimant can perform other jobs which exist in substantial numbers within the economy. See 20 C.F.R. § 404.1520(f) (2005); Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). In making this determination, the ALJ must consider the claimant's age, education, work experience and residual functional capacity. 20 C.F.R. § 404.1520(f) (2005). If the Commissioner identifies appropriate work opportunities for the claimant, given their established residual functional capacity, which exist in significant numbers, then the claimant will not be deemed disabled. See 42 U.S.C.A. § 423(d)(2)(A) (2005).

The Commissioner may carry her burden at step five by eliciting the testimony of a vocational expert in response to a hypothetical which sets out all the limitations and restrictions of the claimant regarding her ability to perform work required by employers. See, e.g., Cass v. Shalala, 8 F.3d 552, 556 (7th Cir. 1993); Born v. Secretary of Health & Human Serv., 923 F.2d 1168, 1174 (6th Cir. 1990); Lewis v. Heckler, 808 F.2d 1293, 1298 (8th Cir. 1987). Although the ALJ's hypothetical question to the VE regarding the existence of suitable jobs may be based on evidence which is disputed, the assumptions in the hypothetical must be supported by the record. See Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).

Plaintiff does not contend there are not significant numbers of jobs as assemblers in the national economy. Plaintiff argues the ALJ's decision may be reversed because the ALJ did not adduce sufficient non-contradictory evidence in the record, from the vocational expert, regarding the availability of sedentary jobs to Plaintiff.

The record reveals the evidence taken at the hearing with regard to the exact classification of the job of cashier was in conflict.  Nonetheless, the other job the vocational expert testified Plaintiff is able to perform, that of assembler, is undisputably sedentary unskilled labor and available in the national economy and locally.  Even if the ALJ erred in regard to the exact classification of the sedentary cashier job, any error was harmless and, therefore, does not provide a basis for remanding this matter to the ALJ.  <u>See</u> <u>Batson v. Commissioner of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1197 (9th Cir. 2003); <u>Cabe v. Barnhart</u>, 2006 WL 377242, at *1 (9th Cir.); <u>Jackson v. Barnhart</u>, 120 Fed. App. 904, 905-06, 102 Soc. Sec. Rep. Serv. 582 (3d Cir. 2005); <u>Frank v. Barnhart</u>, 326 F.3d 618, 622 (5th Cir. 2003); <u>Ischay v. Barnhart</u>, 383 F. Supp. 2d 1199, 1213 (C.D. Cal. 2005).  An ALJ may rely on a vocational expert's testimony that there are jobs in the economy the claimant may perform when the vocational expert's testimony is based on a residual functional capacity supported by substantial evidence in the record.  <u>See</u> <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir. 2005); <u>Magallanes</u>, 881 F.2d at 757.  Substantial evidence in the record supports the ALJ's determination Plaintiff could do a limited range of sedentary work and could

perform in jobs which are available in substantial numbers in the national economy and, therefore, the ALJ's decision was not legal error. See Barker v. Secretary of Health & Human Servs., 882 F.2d 1474, 1478-80 (9th Cir. 1989).

The ALJ could properly rely on the testimony of the vocational expert regarding whether an individual of Plaintiff's age and abilities, with the residual functional capacity found by the ALJ, to find that Plaintiff could perform jobs which were available in the national economy and, therefore, the ALJ's determination at step five was not in error. See, e.g., Johnson, 60 F.3d at 1435 (concluding that the ALJ did not err by relying "solely on the vocational expert's testimony," which constituted substantial evidence in the record to support the ALJ's conclusion that there were jobs available in the national economy); Guilliams v. Barnhart, 393 F.3d 798, 804-05 (8th Cir. 2005); Jones v. Barnhart, 364 F.3d 501, 503 & 507 (3d Cir. 2004); Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004). See also Heckler v. Campbell, 461 U.S. 458, 468 (1983) (noting this inquiry requires the ALJ "to determine an issue that is not unique to each claimant--the types and numbers of jobs that exist in the national economy. This type of general factual issue may be resolved as fairly through rulemaking as by introducing the testimony of vocational experts at each disability hearing."); DeLorme v. Sullivan, 924 F.2d 841, 851 (9th Cir. 1991) ("when vocational experts identify several job categories and thousands of jobs performable in the state by the claimant, we have repeatedly found substantial evidence of performable jobs").

**5.   Plaintiff contends the proper remedy for the ALJ's errors is to order an immediate payment of benefits rather than to remand this matter for further proceedings.**

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful.  However where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits. More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (internal citations and quotations omitted).

Because the Court has concluded the ALJ did not commit any reversible error, this matter should not be remanded for further proceedings.  Cf. Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003)

### VI   Conclusion

The ALJ did not commit non-harmless reversible error when determining if Plaintiff was disabled as that term is defined by federal statutes.  Additionally, although the ALJ's recitation of the appropriate legal standard and supporting facts in the record for her conclusions is arguably sparse, each of the challenged decisions of the ALJ is supported by substantial evidence in the record and, therefore, the ALJ's decision should not be reversed.

The Court notes the issue before the ALJ was whether Plaintiff was disabled as of the alleged onset date of disability, i.e., June 30, 2002, and whether Plaintiff became disabled between June 30, 2002, and the date of the hearing before the ALJ, April 14, 2004.  <u>Cf.</u> <u>Estes v. Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002); <u>Barrett v. Apfel</u>, 40 F. Supp. 2d 31, 38 (D. Mass. 1999) ("all requirements for entitlement must be met before the administrative law judge's decision"); 20 C.F.R. § 404.620 (2005).  Based on the record before the Court, the ALJ could properly determine based on the substantial evidence in the record, that Plaintiff was not "disabled" as that term is defined as of April 14, 2004.   However, it appears that Plaintiff's conditions deteriorated over time and Plaintiff's date last insured is December 31, 2007.  The Court offers no opinion as to whether Plaintiff might be found disabled with an onset date subsequent to April 14, 2004.

**IT IS THEREFORE ORDERED** that Plaintiff's motion for "summary judgment" [Docket No. 13] is **DENIED**, and Defendant's cross-motion for "summary judgment" [Docket No. 17] is **GRANTED**. Judgment shall be entered in favor of Defendant and against Plaintiff with regard to the claims for relief stated in the complaint.

**IT IS FURTHER ORDERED**, as a result of the Court's determination that judgment in favor of Defendant is appropriate, that the Clerk of the Court shall enter judgment accordingly.

DATED this 8th day of May, 2006.




_____
Mark E. Aspey
United States Magistrate Judge